IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

DONALD V. SNOWDEN,         )
         )
    Plaintiff,         )
         )    Case No. 19-cv-01322-JPG
    vs.         )
         )
JEREMY HENNING,         )
         )
    Defendant.

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT STATEMENT OF MATERIAL UNDISPUTED FACTS and MEMORANDUM IN SUPPORT OF MOTION

Defendant, Jeremy Henning, by and through his attorneys, Rachelle Aud Crowe, United States Attorney for the Southern District of Illinois and Suzanne M. Garrison, Assistant United States Attorney, moves for summary judgment pursuant to Fed. R. Civ. P. 56.

## INTRODUCTION

This is a *pro* se *Bivens*[1] suit filed by Plaintiff, Donald V. Snowden, against Special Agent Jeremy Henning of the Drug Enforcement Administration ("DEA"). Prior rulings have established that the only count to be litigated alleges that Agent Henning used excessive force in violation of the Fourth Amendment in arresting Plaintiff pursuant to a federal arrest warrant on September 12, 2019. (Orders, ECF 15, 47, 56; Appeal of Order Dismissing Suit, *Snowden v. Henning*, 72 F.4th 237 (7th Cir. 2023), *cert. denied sub nom. Henning v. Snowden*, No. 23-976, 2024 WL 4426536 (U.S. Oct. 7, 2024)). Summary judgment should be entered for Agent Henning because based upon Plaintiff's deposition testimony and the portion of his arrest that was captured on video[2], there are sufficient undisputed material facts to establish that Agent Henning acted reasonably

---

[1] *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971).
[2] Per the Notice of Filing, the video has been submitted to the Court for *in camera* review.

under the circumstances. "[I]f there are sufficient undisputed material facts to establish that [a law enforcement] officer acted reasonably under the circumstances, then the court must resolve the issue as a matter of law rather than allow a jury to 'second-guess' the officer's actions." *Dawson v. Brown*, 803 F.3d 829, 833 (7th Cir. 2015). Agent Henning additionally invokes qualified immunity as a bar to suit.

## PROCEDURAL HISTORY & BACKGROUND

Plaintiff has been in custody since Agent Henning arrested him on September 12, 2019. (Att. 1, Pl. Dep. at 11). Plaintiff prepared the Complaint on or about November 24, 2019 when he was in the Williamson County Jail awaiting trial in *United States v. Snowden et al.*, SDIL No. 19-cr-40081-JPG. (Att. 1, Pl. Dep. at 20-22). When Plaintiff filed this lawsuit, he made no effort to understand the law. (Att. 1, Pl. Dep. at 105). Plaintiff felt like he "got beat up on a warrant that [he believes] was not a valid warrant." (Att. 1, Pl. Dep. at 66). Plaintiff did understand that when he signed the Complaint that whatever he put in writing and filed with the Court should be a true statement and that he should have evidence in support of any allegations of fact. (Att. 1, Pl. Dep. at 21).

On August 11, 2022 this Court sentenced Plaintiff to serve a 360-month sentence of imprisonment following his conviction at trial for conspiracy to distribute methamphetamine and distribution of methamphetamine. (Att. 1, Pl. Dep. at 11). The conviction and sentence were affirmed on appeal after Plaintiff's appointed counsel moved to withdraw because due to the lack of any meritorious issue to be pursued on appeal. *United States v. Snowden*, No. 22-2426, 2024 WL 1986001, at *1 (7th Cir. May 6, 2024)(affirming conviction and sentence and granting counsel's motion to withdraw pursuant to *Anders v. California*, 386 U.S. 738, 744 (1967). During

the pendency of this suit, both while incarcerated at FCI Yazoo City and at his prior institution (FCI McCreary), Plaintiff has had access to a law library. (Att. 1, Pl. Dep. at 12).

Plaintiff had several weeks' notice prior to the taking of his video deposition on October 2, 2022. (Att. 1, Pl. Dep. at 6). Prior to the deposition the hotel surveillance video which depicted a portion of his arrest was provided to him at his institution, and he was able to watch it about five times. (Att. 1, Pl. Dep. at 7-8). At the time of Plaintiff's deposition he was 42 years old, was taking no medication and was not being treated for any medical conditions. (Att. 1, Pl. Dep. at 13). Plaintiff can read and write the English language, has a G.E.D., and has associates' degrees in construction occupations and agriculture. (Att. 1, Pl. Dep. at 14, 20). Plaintiff has no formal legal or medical training. (Att. 1, Pl. Dep. at 15). Plaintiff has prior experience as a *pro se* litigant as he represented himself during some pretrial proceedings and at trial and sentencing in his criminal case, with benefit of standby counsel. See *United States v. Snowden*, 2024 WL 1986001 (7th Cir. May 6, 2024).

## UNDISPTUED MATERIAL FACTS

### Plaintiff and Defendant's First Meeting on August 2, 2019

1. As part of the investigation giving rise to the charges in *United States v. Snowden et al.*, SDIL No. 19-cr-40081-JPG, on August 2, 2019 law enforcement officers executed a search warrant at an apartment Plaintiff shared with his girlfriend. (Att. 1, Pl. Dep. at 87).

2. A gun was seized from the apartment during the execution of the search warrant. (Att. 1, Pl. Dep. at 113).

3. On August 2, 2019 officers arrested Plaintiff and took him to the Carbondale Police Department where he remained for approximately seven hours. (Att. 1, Pl. Dep. at 87-88).

4.  While at the Carbondale Police Department, DEA agents and Carbondale police officers interviewed Plaintiff and asked him questions about drug trafficking.  (Att. 1, Pl. Dep. at 88).

5.  DEA SA Ehler advised Plaintiff that DEA had been investigating him for drug trafficking.  (Att. 1, Pl. Dep. at 88, 97).

6.  During the interview, Agent Henning entered the room and Agent Ehler introduced Agent Henning to Plaintiff and they shook hands.  (Att. 1, Pl. Dep. at 34, 89).

7.  Agent Ehler, Agent Henning and Plaintiff sat and spoke with each other, and the agents asked Plaintiff if he would act as an informant and assist in narcotics investigations.  (Att. 1, Pl. Dep. at 89, 91, 108; ECF. 57, ¶6).

8.  Agent Henning was in the interview room with Plaintiff for approximately a half hour.  (Att. 1, Pl. Dep. at 106).

9.  During the half hour when Agent Henning was present, Agent Henning and Agent Ehler advised Plaintiff that they believed they had enough evidence to charge him with federal drug trafficking crimes.  (Att. 1, Pl. Dep. at 107).

10.  Agent Henning and Agent Ehler explained that cooperation as an informant could lead toward consideration on a future sentence.  (Att. 1, Pl. Dep. at 92, 108).

11.  Ultimately, Plaintiff was released on August 2, 2019 and he had phone numbers for the agents so that he could contact them when he was ready to participate in a full debriefing.  (Att. 1, Pl. Dep. at 96).

12.  Plaintiff did not contact the agents after his release from the Carbondale Police Department on August 2, 2019.  (Att. 1, Pl. Dep. at 97).

4

**The Quality Inn Motel**

13.   Following the search of his apartment by the police in August, 2019 and up to September 12, 2019 Plaintiff lived at the Quality Inn Motel in Carbondale, Illinois.  (Att. 1, Pl. Dep. at 14).

14.   Plaintiff would typically pay for his hotel room day-by-day.  (Att. 1, Pl. Dep. at 23).

15.   On September 10, 2019 and following a return of an indictment charging Plaintiff with distribution of methamphetamine, a warrant issued for Plaintiff's arrest in *United States v. Snowden et al.*, SDIL No. 19-cr-40081-JPG.  (Att. 1, Pl. Dep. at 57-58).

**Plaintiff's Testimony Regarding Events of September 12, 2019**

16.   On September 12, 2019 Plaintiff weighed around 203 pounds and was six feet tall. (Att. 1, Pl. Dep. at 52).

17.   The Quality Inn has a surveillance camera that focused on the desk area of the hotel lobby. (Att. 1, Pl. Dep. at 7-8, 32,  35).

18.   On September 12, 2019 the Quality Inn Clerk called Plaintiff on the room phone and asked him to pay for his room.  (Att. 1, Pl. Dep. at 26).

19.   Plaintiff walked up to the counter in the lobby and pulled out cash to pay.  (Att. 1, Pl. Dep. at 31).

20.   Plaintiff was at the counter when Agent Henning entered the hotel lobby.  (Att. 1, Pl. Dep. at 32).

21.   Agent Henning was acting within the scope of his employment as a federal law enforcement officer when entering the hotel lobby to arrest Plaintiff.  (Certification of Scope of Employment, ECF 25-1; Answer, ECF 57, ¶3).

22.  Plaintiff testified that he saw Agent Henning in his peripheral vision.  (Att. 1, Pl. Dep. at 35).

23.  Plaintiff testified that he did not see any warrant in Agent Henning's hand for Plaintiff to know that he was under arrest.  (Att. 1, Pl. Dep. at 57-58).

24.  Plaintiff testified that he felt someone try to grab his arm and thought, "Whoa, whoa, what's happening?"  (Att. 1, Pl. Dep. at 35).

25.  Plaintiff turned to the side and stepped back.  (Att. 1, Pl. Dep. at 36-37).

26.  When Agent Henning tried to put handcuffs on Plaintiff, Plaintiff moved back from Agent Henning and looked at him as Plaintiff was moving back.  (Att. 1, Pl. Dep. at 106).

27.  Plaintiff acknowledged that the video depicts him putting his hand toward the area of his pocket.  (Att. 1, Pl. Dep. at 113).

28.  The door to the hotel lobby opened and Plaintiff and Agent Henning ended up behind the door and in the hotel office with the Clerk.  (Att. 1, Pl. Dep. at 38-39).

29.  Plaintiff did not recall whether Agent Henning told him he was under arrest, nor did he deny that Agent Henning did tell him he was under arrest.  (Att. 1, Pl. Dep. at 38).

30.  Plaintiff testified that after the door shut, he recognized that the man approaching him was Agent Henning.  (Att. 1, Pl. Dep. at 108).

31.  After the door shut, Plaintiff ended up on his back on the ground facing up.  (Att. 1, Pl. Dep. at 40).

32.  Agent Henning also ended up on the ground, and both Plaintiff and Agent Henning were facing the same direction.  (Att. 1, Pl. Dep. at 39-40).

33.  Plaintiff recalled that Agent Henning told him that he was under arrest as Plaintiff was getting hit.  (Att. 1, Pl. Dep. at 41).

34.  Agent Henning was reaching for Plaintiff's arm and had handcuffs in his hand.  (Att. 1, Pl. Dep. at 41).

35.  Plaintiff was not handcuffed when Agent Henning hit him.  (Att. 1, Pl. Dep. at 42).

36.  Plaintiff was still in motion after Agent Henning hit him, continuing to move, to include bringing his arms to his head.  (Att. 1, Pl. Dep. at 41-42).

37.  Plaintiff testified that when he was on the ground trying to cover his face that Agent Henning "could have assumed that I was resisting him because I'm trying to cover my face up." (Att. 1, Pl. Dep. at 50).

38.  Plaintiff was trying to move both of his arms, but he could not get the one arm free; he twisted his body to decide to try to get free.  "That's whenever I used my right hand and tried to— tried to crawl it out."  (Att. 1, Pl. Dep. at 42-43).

39.  After having been hit, Plaintiff stood up and asked, "Why are you hitting me?" (Att. 1, Pl. Dep. at 43-44; 46-48; 51).

40.  When standing, Plaintiff did not put his arms behind his back, he pushed them out to the side and said, "Why are you hitting me."  (Att. 1, Pl. Dep. at 44).

41.  After the "commotion" had begun, Plaintiff understood that Agent Henning was trying to arrest him.  (Att. 1, Pl. Dep. at 51).

42.  Plaintiff testified that Agent Henning hit him again and drug him back to the ground; Plaintiff just laid there and it was over.  (Att. 1, Pl. Dep. at 45).

43.  Plaintiff testified that Agent Henning hit him three times in total, striking him in the face.  (Att. 1, Pl. Dep. at 45).

44.  Plaintiff testified that Agent Henning hit him three times while Plaintiff was on the ground and once when he was standing up.  (Att. 1, Pl. Dep. at 45).

45.  The following exchange occurred:

Q. So, as I understand it, once you -- you started out on the ground. You were hit. You ended up back on your feet. And when you ended up back on your feet, you did not place your hands behind your back, correct?

A. Correct, because I didn't know that he was trying to really arrest me if he was hitting me. I'm trying to figure out what I did wrong because the -- I guess the indictment was from the month before. So when he come in there, I'm, like, I didn't sell no drugs so why am I under arrest at that moment? I didn't do nothing.  (Att. 1, Pl. Dep. 46).

46.  Plaintiff was aware that Agent Henning had handcuffs and was trying to handcuff him; Plaintiff was challenging Agent Henning by talking and asking, "What are you doing?"  (Att. 1, Pl. Dep. at 46-48).

47.  By the time other officers and agents had come into the room by climbing over the desk, "the incident was over" and there was no "fighting" or "hitting."  (Att. 1, Pl. Dep. at 49).

48.  Plaintiff believed that it was Detective Pingolt who had handcuffed him; he wasn't sure of the name but knew it was another officer (not Agent Henning) who had handcuffed him.  (Att. 1, Pl. Dep. at 48-49).

49.  Plaintiff had not been handcuffed until the other officers entered the office by jumping over the desk.  (Att. 1, Pl. Dep. at 49-50).

50.  At no time did Agent Henning use any type of pepper spray or mace.  (Att. 1, Pl. Dep. at 51).

51.  At no time did Agent Henning draw a firearm or point a firearm at Plaintiff.  (Att. 1, Pl. Dep. at 52).

52.  At no time did Agent Henning strike Plaintiff with anything other than his hands.  (Att. 1, Pl. Dep. at 52).

53.  At no time did Plaintiff lose consciousness.  (Att. 1, Pl. Dep. at 52).

54.  At no time did Plaintiff begin bleeding.  (Att. 1, Pl. Dep. at 52).

55.  After the arrest, Plaintiff was taken to the Williamson County Jail.  (Att. 1, Pl. Dep. at 71).

56.  When Plaintiff arrived at the Williamson County Jail, he did not need emergency care and he did not need to go to the hospital.  (Att. 1, Pl. Dep. at 71, 74).

57.  The Complaint alleges that Plaintiff sustained a fractured eye socket, but there is no medical evidence that Plaintiff had one; Plaintiff has never had an x-ray of his eye socket.  (Att. 1, Pl. Dep. at 61-65).

58.  As for lasting physical injury from being punched, Plaintiff says that he can feel a little knot on the bone.  (Att. 1, Pl. Dep. at 65-66).

59.  Plaintiff testified that he has anxiety from his arrest because he never experienced force like that in his life; he has "never been arrested by a federal agent to know what they can and can't do."  (Att. 1, Pl. Dep. at 67-69).

**Hotel Surveillance Video (DVD, Video Ex. 1; Att. 2, Agent Ehler Declaration)**

60.  At 11:56:50 Plaintiff can be seen approaching the counter of the hotel lobby; the Clerk, a woman, is behind the counter.  (DVD, Video Ex. 1, Clip 1).

61.  At 11:57:05 Plaintiff has turned and is looking out the window.  (DVD, Video Ex. 1, Clip 1).

62.  At 11:58:10 (depicted in the photo below) Agent Henning enters the lobby; as the frames advance he can be seen pulling handcuffs from his back pocket.  (DVD, Video Ex. 1, Clip 2; IMG_2121.MOV at :37 seconds).



63.  At 11:58:12,  Defendant reaches for Agent Henning's right arm; Plaintiff begins to step backward; Agent Henning is holding a pair of handcuffs at chest level; Plaintiff has something in his right hand.  (DVD, Video Ex. 1, Clip 2).



64. At 11:58:13, Plaintiff begins to step back; his right arm moves toward his pocket. (DVD, Video Ex. 1, Clip 2).





65. At 11:58:14, Agent Henning has his hands on Plaintiff's chest, Plaintiff's hand is near his pocket, Plaintiff's back is against the door to the hotel office and the door is opening. (DVD, Video Ex. 1, Clip 2).





66.    Plaintiff and Defendant enter the hotel office at 11:58:15 as Plaintiff's shoulder is against the door; Plaintiff's phone has dropped to the floor.  (DVD, Video Ex. 1, Clip 2).



67. at 11:58:17 Defendant's buttock can be seen; his leg is bent at the knee.  (DVD, Video Ex. 1, Clip 2).



68. The office door shuts at 11:58:18. (DVD, Video Ex. 1, Clip 2; IMG_2121.MOV at :46 seconds).

69. After the office door shuts, Agent Henning and Plaintiff are out of view of the surveillance camera.

70. The surveillance camera continues to film the lobby and records the passage of time. (DVD, Video Ex. 1).

71. At 11:58:18, the Clerk appears to be trying to stay out of the way of the area directly behind the door. (DVD, Video Ex. 1, Clip 2).

72. At 11:58:21 an officer enters the lobby. (DVD, Video Ex. 1, Clip 2).

73. At 11:58:24 a second officer enters the lobby. (DVD, Video Ex. 1, Clip 2).

74. With urgency, the officers rush toward the closed office door at 11:58:25 and are not able to open it. (DVD, Video Ex. 1, Clip 2; IMG_2121.MOV at :52 seconds).

14

75.   At 11:58:31 the second officer on scene begins climbing over the counter. (DVD, Video Ex. 1, Clip 2; IMG_2121.MOV at :58 seconds).

76.   The first officer who had arrived on scene begins climbing over the counter at 11:58:42 as a third officer runs into the lobby.  (DVD, Video Ex. 1, Clip 2; IMG_2121.MOV at  1:09 minute).

77.   At 11:58:46 the third officer climbs over the counter and enters the office.  (DVD, Video Ex. 1, Clip 2; IMG_2121.MOV at 1:14 minute).

78.   At 11:58:51 the Clerk can be seen standing in the office, appearing to position herself away from the area directly behind the door.  (DVD, Video Ex. 1, Clip 2).

79.   By 12:01:26 the office door is open, Agent Henning is standing in the lobby, and a uniformed officer is walking through the door.  (DVD, Video Ex. 1, Clip 3).

80.   At 12:01:31 Agent Henning is photographing something on the floor.   (DVD, Video Ex. 1, Clip 3).

81.   At 12:01:36 Plaintiff can be seen standing in the office with the second and third officer who had arrived at the scene.  (DVD, Video Ex. 1, Clip 3).



**Defendant's Testimony at Plaintiff's Criminal Trial (Criminal Doc. #34) & Admissions in the Answer [ECF 57]**

82.   During Plaintiff's criminal trial, and in response to questioning from Plaintiff, Agent Henning testified that he told Plaintiff that he was under arrest and to put his hands behind his back.  (*United States v. Snowden*, SDIL No. 22-2426, Doc. 344 at p. 90, 123; *see also* Answer, ECF 57, ¶6).

83.   Agent Henning testified that he did not push Plaintiff through a door; Plaintiff fled backward through a door, fleeing from an attempt to arrest him.  (*Id.* at 123-124; *see also* Answer, ECF 57, ¶8).

84.   Agent Henning testified that he punched Plaintiff in the face because Plaintiff was resisting arrest and Agent Henning believed that he was a substantial threat to him.  (*Id.* at p. 88, 130; *see also* Answer, ECF 57, ¶9).

85.   Agent Henning believes the force he used was justified.  (*Id.* at p. 90).

## SUMMARY JUDGMENT STANDARDS

The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R.Civ. P. 56(a).  The movant may support the motion by citing to materials in the record, including the depositions, affidavits, and other documents.  Fed. R. Civ. P. 56(c)(1); *Spivey v. Adaptive Mktg. LLC*, 622 F.3d 816, 822 (7th Cir. 2010).   In assessing whether summary judgment is warranted, the court must construe all evidence, as well as the inferences reasonably drawn therefrom, in the light most favorable to the non-moving party.  *Spivey*, 622 F.3d at 822.  Any inference drawn must be reasonable, however, and "[i]inferences that rely upon speculation or conjecture are insufficient."  *Armato v. Grounds*, 766 F.3d 713, 719 (7th Cir. 2014).

The non-moving party, on the other hand, must respond with facts establishing that there remains a genuine issue for trial.  *Armato*, 766 F.3d at 719.  "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  *Scott v. Harris*, 127 S. Ct. 1769, 1776 (2007).  *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (in order to overcome a properly supported motion for summary judgment, a nonmovant must establish a factual dispute that materially affects the outcome).  Applying *Scott*, the Seventh Circuit has recognized that, "a video record of the events at issue can evaporate any factual dispute that would otherwise exist." *United States v. Norville*, 43 F.4th 680, 682 (7th Cir. 2022).  Stated succinctly, summary judgment is "the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events." *Steen v. Myers*, 486 F.3d 1017, 1022

(7th Cir. 2007) (*quoting Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 859 (7th Cir. 2005) (other citations omitted)).

## LEGAL STANDARDS

The "right to make an arrest...necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham v. Connor*, 490 U.S. 386, 396 (1989). Where an excessive force claim arises in the context of an arrest, it is analyzed under the Fourth Amendment's objective reasonableness standard from the perspective of the officer on the scene. *Plumhoff v. Rickard*, 572 U.S. 765, 774 (2014), citing *Graham,* 490 U.S. at 395.   In evaluating the reasonableness of the amount of force used in a particular scenario, *Graham* held that, as in other Fourth Amendment contexts, "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397.   Factors relevant to the totality of the circumstances inquiry include: (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or others; and (3) whether he is actively resisting arrest or attempting to evade arrest by flight. *Graham*, 490 U.S. at 396.   When police officers face what is essentially a fluid situation, they are entitled to graduate their response to meet the demands of the circumstances confronting them. *Graham*, 490 U.S. at 396–97.   The objective reasonableness standard requires courts to "'balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.'" *Abbott v. Sangamon Cnty., Ill.*, 705 F.3d 706, 724 (7th Cir. 2013), citing *Scott v. Harris*, 550 U.S. 372, 383 (2007)

*Graham* also holds that the reasonableness of use of force must not be judged "with the 20/20 vision of hindsight" but rather from the perspective of a reasonable officer on the scene. *Id.* "The calculus of reasonableness must embody allowance for the fact that police officers are often

18

forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97.   Courts "give considerable leeway to law enforcement officers' assessments about the appropriate use of force in dangerous situations." *Abbott*, 705 F.3d at 724, citing *Baird v. Renbarger*, 576 F.3d 340, 344 (7th Cir.2009).  Police are entitled to err on the side of caution when faced with an uncertain or threatening situation." *Johnson v. Scott*, 576 F.3d 658, 659 (7th Cir. 2009)(observing that officer had no idea how plaintiff was going to behave once he was cornered and that the law does not require an officer to take an apparent surrender at face value).

Almost thirty years after *Graham*, the Supreme Court offered another nonexclusive list of considerations that reflect "objective circumstances potentially relevant to a determination of excessive force," including "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015).   In its totality of the circumstances analysis, the Seventh Circuit has also considered "whether the individual was under arrest or suspected of committing a crime; whether the individual was armed; and whether the person was interfering or attempting to interfere with the officer's duties."  *Smith v. Finkley*, 10 F.4th 725, 736 (7th Cir. 2021).    The Seventh Circuit has additionally observed that an officer's choice among tactical considerations in approaching a scenario (such as planning for the encounter or using aggressive questioning) which provoke resistance do not constitute an independent violation of a subject's constitutional rights. *Est. of Biegert v. Molitor*, 968 F.3d 693, 698 (7th Cir. 2020) (Barrett, J.).    The Seventh Circuit has observed that, "Our caselaw is far from clear as to the relevance of pre-seizure conduct, or

even as to a determination as to what conduct falls within the designation 'pre-seizure,' although the majority of cases hold that it may not form the basis for a Fourth Amendment claim." *Williams v. Indiana State Police Dep't*, 797 F.3d 468, 482–83 (7th Cir. 2015). Since *Graham*, the Seventh Circuit has treated the reasonableness of force as a legal issue. *Bell v. Irwin*, 321 F.3d 637, 640 (7th Cir. 2003). "When material facts (or enough of them to justify the conduct objectively) are undisputed, then there would be nothing for a jury to do except second-guess the officers, which *Graham* held must be prevented." *Id. Phillips v. Cmty. Ins. Corp.*, 678 F.3d 513, 520 (7th Cir. 2012)("Objective reasonableness of force is a legal determination rather than a pure question of fact for the jury to decide.").

It should be noted that the Supreme Court recently granted certiorari in *Barnes v. Felix*, No. 23-1239, a deadly force case arising from the Fifth Circuit, and that oral argument is set for January 22, 2025. *Barnes* involves an investigatory traffic stop of a rental car associated with tollway offenses and the sequence of events preceding the use of deadly force, to include the officer's decision to jump onto the sill of the vehicle with gun drawn and the decedent's decision to flee the scene in his vehicle (with the officer holding on to the side of the car) despite the directive to exit the vehicle. The petition asserts that the Second, Fourth, Fifth, and Eighth Circuits have impermissibly adopted a "moment of the threat doctrine," which evaluates the reasonableness of an officer's actions exclusively in the narrow window when the officer's safety was threatened. Respondents counter that the Fifth Circuit's dismissal of petitioner's case was appropriately supported by the analysis required by *Graham*. It is logical to conclude that the Supreme Court's ultimate decision in *Barnes* will address application of *Graham's* totality of the circumstances test. Presently lacking insight into Plaintiff's theory of liability in this case, Agent Henning will await Plaintiff's response before taking a position on whether he will request a stay pending a ruling in

*Barnes.*

Qualified immunity is an affirmative defense, and once raised it becomes the plaintiff's burden to defeat it." *Jewett v. Anders*, 521 F.3d 818, 823 (7th Cir. 2008). To determine whether a law enforcement officer is entitled to qualified immunity, a court will ask (1) whether the allegations make out a deprivation of a constitutional right and (2) whether the right was clearly established at the time of the alleged misconduct. *Brooks*, 653 F.3d at 483. "If either inquiry is answered in the negative, the defendant official is protected by qualified immunity." *Koh v. Ustich*, 933 F.3d 836, 844 (7th Cir. 2019) (citation and internal quotation marks omitted). Whether a government official is entitled to qualified immunity is a legal question for resolution by the Court, not a jury. *Hunter v. Bryant*, 502 U.S. 224, 228 (1991). The Court may address the prongs in whichever order it believes is best suited to the circumstances of the particular case at hand. *Brooks*, 653 F.3d at 483. The Supreme Court has repeatedly advised courts "not to define clearly established law at a high degree of generality." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018).

## AGENT HENNING'S USE OF FORCE WAS OBJECTIVELY REASONABLE UNDER THE TOTALITY OF THE CIRCUMSTANCES

### As a Matter of Law, Probable Cause Supported the Arrest

The arrest warrant issued on September 10, 2019 was pursuant to an Indictment charging Plaintiff with Distribution of over Fifty Grams of Actual Methamphetamine in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A). *United States v. Snowden et al.,* SDIL No. 19-cr-40081-JPG (Doc. 1 & 4). A warrant may only be approved after "an independent judgment that probable cause exists for the warrant." *Whiteley v. Warden, Wyo. State Penitentiary*, 401 U.S. 560, 565 (1971). "An indictment—fair on its face and rendered by a properly constituted grand jury— conclusively establishes probable cause to believe the charged defendant committed the crimes

charged." *Kaley v. United States*, 571 U.S. 320, 328 (2014). Additionally, an indictment "triggers issuance of an arrest warrant without further inquiry into the case's strength." *Kaley*, 571 U.S. at 329.

The indictment established probable cause to believe Plaintiff had committed an offense and a valid warrant commanded Plaintiff's arrest. Probable cause is an absolute defense to a claim of unlawful arrest in violation of the Fourth Amendment. *Brooks v. City of Aurora, Ill.,* 653 F.3d 478, 483 (7th Cir. 2011). Plaintiff cannot establish that probable cause to arrest him was lacking. Though an arrest warrant existed, Agent Henning was not obliged to approach Plaintiff with a copy of it as Plaintiff seemed to suggest in his deposition testimony. *See* Fed. R. Crim. P. 4, Committee Notes on Rules-2002 Amendment. (The new rule continues the current provision that the arresting officer need not have a copy of the warrant, but if the defendant requests to see it, the officer must show the warrant to the defendant as soon as possible).

### The Warrant Commanded Plaintiff's Arrest for a Serious Drug Offense

The methamphetamine distribution charge in the Indictment carried a mandatory minimum penalty of ten years and a maximum potential penalty of life imprisonment. *United States v. Snowden et al.*, SDIL No. 19-cr-40081-JPG, Doc. 4, p. 4. The charged offense was a serious felony, and Plaintiff had four prior felony drug convictions subjecting him to enhanced penalties. (Att. 1, Pl. Dep. at 93-95). Under the Bail Reform Act, by virtue of the penalties associated with the charged controlled substance offense, there is a rebuttable presumption that Defendant posed a danger to the community and a risk of flight. 18 U.S.C. § 3142(e)(3)(A). Agent Henning was endeavoring to arrest Plaintiff for a serious felony offense and Plaintiff was aware that DEA had been investigating him.

22

**Drug Trafficking is Associated with Weapons Possession**

The Seventh Circuit has recognized the association between firearms and narcotics trafficking and as noted that weapons are tools of the trade. *United States v. Cooper*, 19 F.3d 1154, 1163 (7th Cir. 1994); *United States v. Rush*, 890 F.2d 45, 49 (7th Cir. 1989). It would be objectively reasonable for an officer arresting Plaintiff to consider the association between narcotics trafficking and the possession of weapons.

**Plaintiff Posed an Immediate Threat to the Safety of Defendant and the Hotel Clerk**

While Plaintiff maintained in his deposition that Agent Henning "pushed" him into the door (Att. 1, Pl. Dep. at 35-38), on video he can be seen stepping backward and away from Agent Henning while Plaintiff's hand was near his own pocket. Plaintiff's deposition testimony also indicates that he stepped back. (Att. 1, Pl. Dep. at 36-37, 106). Given the nature of the charged offense and Plaintiff's movement of his hand toward his pocket, it would not be objectively unreasonable for an arresting officer in like circumstances to consider the possibility that Plaintiff was not only retreating and engaging in active resistance but was also placing his hand near his pocket in an effort to retrieve a weapon. It was not unreasonable for Agent Henning to make physical contact with Plaintiff by placing his hands on his chest and to endeavor to restrain him expeditiously. "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *See Graham*, 490 U.S. at 396. The fact that no weapon was recovered from Plaintiff is immaterial; he made a furtive movement that was consistent with reaching to the area of his waist to retrieve a weapon. Only facts known to officers at the time of arrest matter in the reasonableness determination. *Smith v. Adams*, 804 F. App'x 390, 393 (7th Cir. 2020), citing *Graham* 490 U.S. at 396. *See also Sherrod v. Berry*, 856 F.2d 802, 807 (7th Cir. 1988) (*en banc*) ("It is not necessary that the danger which gave rise to the belief

actually existed; it is sufficient that the person resorting to self defense at the time involved reasonably believed in the existence of such a danger, and such reasonable belief is sufficient even where it is mistaken.")

Before the office door opened, Plaintiff was not submitting to arrest when approached by an officer known to him who displayed handcuffs.  (Att. 1, Pl. Dep. at 38).  None of the footage captured before the office door closed depicts an excessive use of force during the few seconds that transpired.   Once Plaintiff and Agent Henning ended up behind a closed door and on the ground enclosed in the office with a bystander (the Clerk) it was objectively reasonable for Agent Henning to consider Plaintiff presented an increased risk of danger under the totality of the circumstances.    The possibility that Plaintiff was in possession of a weapon had not been eliminated.

**Plaintiff's Actions Behind the Closed Door were Consistent with Resisting Arrest**

An arrest warrant commanded that Agent Henning take Plaintiff into custody, and he is afforded "enhanced deference" to his on-scene judgment about the level of necessary force necessary to make the arrest.  *Dockery v. Blackburn*, 911 F.3d 458, 464 (7th Cir. 2018).  An important factor in the force analysis is whether the subject was actively resisting.  *Id.* at 467.  Active resistance can include "kicking and flailing," "declining to follow instructions while acting in a belligerent manner," and "swatting an arresting officer's hands away while backpedaling."  *Id.* (internal citations omitted).

Plaintiff maintained during his deposition that he was not resisting arrest.  (Att. 1, Pl. Dep. 106).  The overall content of his deposition testimony and the video evidence are inconsistent with that representation.   In any event, a subject's "intent to resist is immaterial under the objective test; [the court] ask[s] only how a reasonable officer would have perceived the circumstances."

24

*Dockery,* 911 F.3d at 466; *see also* Brooks, 653 F.3d at 484 ("Although there may be a genuine dispute of material fact with respect to whether Mr. Brooks intentionally attempted to withstand the force or effect of Officer Lill's efforts to arrest him in such a way as to impede, hinder, interrupt, prevent, or delay the performance of Officer Lill's duties, the undisputed facts suffice to establish that a reasonable officer could have believed that he did.")(internal citations omitted).  The Fourth Amendment does not consider the arrestee's state of mind. *See Torres v. Madrid*, 592 U.S. 306, 318 (2021) (in discussing the Fourth Amendment seizure inquiry, noting that a seizure does not "depend on the subjective perceptions of the seized person.")

It was objectively reasonable for an officer in Agent Henning's position to conclude that Plaintiff's actions were not only consistent with actively resisting arrest, but were also consistent with endeavoring to retrieve a concealed weapon.  Agent Henning and Plaintiff had previously met.  The month before, Agent Henning had spent a half hour in an interview with Plaintiff telling him that he was under investigation and that DEA was prepared to seek drug trafficking charges on him.  Agent Henning entered the hotel lobby with handcuffs.  A reasonable officer in Agent Henning's position could conclude that Plaintiff realized the display of handcuffs, when coupled with their prior meeting, meant that Agent Henning was there to arrest him for a serious federal drug offense carrying a lengthy sentence.  After making eye contact with Agent Henning, Plaintiff stepped back.  Plaintiff's hand reached for his own pocket.  According to Plaintiff's testimony: "He tried to put the cuffs on me, and I moved back from him and looked at him as I was moving back with my hands like (indicates)."  (Att. 1, Pl. Dep. at 106).

Once Plaintiff and Agent Henning were behind the office door, Plaintiff testified that he recognized Agent Henning.  (Att. 1, Pl. Dep. at 108).  Plaintiff's testimony indicates that he did not submit to Agent Henning's efforts to handcuff him while the two were behind the closed office

door for approximately twenty-eight seconds—from 11:58:18 (when the door closed) to 11:58:46 (when all three backup officers had succeeded in jumping over the counter to enter the office). During that period of time Agent Henning punched Plaintiff while both were on the ground. While they were on the ground Plaintiff engaged in conduct that he admits Agent Henning could have construed as resisting: "The whole incident that me getting hit in the face on the ground, that would have been the only time that he could have assumed that I was resisting him because I'm trying to cover my face up." (Att. 1, Pl. Dep. at 50). Once he stood up from the ground, Plaintiff did not submit to being handcuffed, he pushed his arms out and said, "Why are you hitting me?" (Att. 1, Pl. Dep. at 44). Plaintiff testified that at no time while he was in the office with Agent Henning did Plaintiff place his wrists behind his back to be handcuffed. (Att. 1, Pl. Dep. at 51). Plaintiff was not handcuffed when Agent Henning punched him. (Att. 1, Pl. Dep. at 42, 48-50). Plaintiff was talking during the incident, challenging Agent Henning and asking, "What are you doing?" (Att. 1, Pl. Dep. at 47-48). The facts known to Agent Henning were that Plaintiff was failing to submit to a lawful effort to arrest him made by someone who he knew to be a law enforcement officer. Agent Henning was under no obligation to cease his efforts to restrain Plaintiff in lieu of engaging in a dialogue with him.

Agent Henning did not employ a Taser, a firearm or any other weapon; he used minimal force in a fluid situation in which he found himself cornered in a locked office with a third party and a subject wanted on warrant for a serious drug offense.    The entire encounter behind the closed door was 12 to 28 seconds in duration, and Plaintiff has not handcuffed at the time he was struck. Punches or knee strikes to subdue an arrestee who is stiffening their body and has elbowed an officer in the neck, are a reasonable use of force. *Turner v. City of Champaign*, 979 F.3d 563, 569 (7th Cir. 2020) ("the police may use significant force to subdue someone who is actively

resisting lawful detention").

Plaintiff cannot base an excessive force claim on the fact that he ended up with ecchymosis/black eye.   The fact that an arrestee subjected to force suffers an injury does not make a use of force unreasonable.  *Johnson v. Rogers*, 944 F.3d 966, 969 (7th Cir. 2019) ("[a]ny takedown can go awry — some suspects fall clumsily, while others have fragile bones — but, if the officers use steps reasonably likely to effect a clean takedown, an injury does not lead to liability.")(finding qualified immunity where subject was not under control when officer used his knee to unbalance plaintiff).  The focus is on the force used, not the resulting effects.  *Id.*   In sum, Agent Henning's actions as depicted on video and as recounted by Plaintiff's testimony represent the exercise of great restraint on the part of Agent Henning resulting in a conservative use of force.

## DEFENDANT IS ENTITLED TO QUALIFIED IMMUNITY

Plaintiff must demonstrate that the law in September, 2019 clearly established that Agent Henning's conduct would violate the Constitution.  Plaintiff does not meet his burden by merely asserting that the "right to be free of excessive force" was clearly established.  *City of Escondido, Cal. v. Emmons*, 586 U.S. 38, 43 (2019)(stressing the need to identify a case where an officer acting under similar circumstances was held to have violated the Fourth Amendment and holding that "existing precedent must place the lawfulness of the particular action]beyond debate.")  "Use of excessive force is an area of the law in which the result depends very much on the facts of each case, and thus police officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue."  *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018)(per curiam). An officer "cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it."  *Id.* at 1153.  "That sounds like a high bar because it is—

qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Lopez v. Sheriff of Cook Cnty.*, 993 F.3d 981, 988 (7th Cir. 2021). "The benefit of hindsight does not lower the clear and high bar that is the law of qualified immunity." *Lopez*, 993 F.3d at 992.

While it was well-established prior to 2019 that police officers cannot continue to use force once a suspect is subdued, *Abbott*, 705 F.3d at 732, Plaintiff's deposition testimony indicates that he was not handcuffed or subdued at the time Defendant struck him. This case does not implicate the right to be free from the use of force once subdued. Critically, the punches occurred after Plaintiff, Agent Henning and a Clerk were cornered in an office together *after* Plaintiff had reached toward his pocket, after he had backed away from Agent Henning, and *before* it had been ascertained that Plaintiff was unarmed. A warrant authorized the arrest of Plaintiff and the use of reasonable force to accomplish that result. Here, the use of force did not occur over any significant amount of time—the force occurred during an approximate 12 to 28 second period of time-- and, critically, ended when backup officers entered the office and handcuffed Plaintiff. At the end of the encounter, Plaintiff had blackened eyes, and he testified that he did not bleed, lose consciousness or require immediate medical assistance. During the course of executing an arrest warrant, Agent Henning could have reasonably concluded that he it was necessary to protect both himself and the Clerk by punching Plaintiff as a means of gaining control over the situation pending the arrival of backup officers. A clean takedown is not excessive when it is used to control an individual who poses a threat or fails to comply with an officer's demands. *Moss v. Schimp*, No. 3:20-CV-107-MAB, 2022 WL 1443422, at *8 (S.D. Ill. May 6, 2022), citing cases.

During the brief time that Agent Henning was enclosed in the office with Plaintiff and the Clerk after Plaintiff's furtive hand movement toward his pocket, Agent Henning is afforded

"reasonable leeway" in assessing the threat and responding to it.  *Brumitt v. Smith*, 102 F.4th 444, 449 (7th Cir. 2024).  Delivering several punches during the 12 to 28 second period of time pending arrival of backup officers was not an excessive use of force.   Rather, it was a reasonable and conservative effort to gain control over the situation in order to accomplish the arrest commanded by the warrant.   As Agent Henning's actions were reasonable under the totality of the circumstances, or, alternatively, because Plaintiff cannot show Agent Henning's actions violated a clearly established right, Plaintiff's excessive force claim must fail, entitling Agent Henning to summary judgment.

WHEREFORE, Defendant requests that summary judgment be entered in his favor and that the Court award of costs pursuant to 28 U.S.C. §1920.

RACHELLE AUD CROWE
United States Attorney

*/s/ Suzanne M. Garrison*
SUZANNE M. GARRISON
Assistant United States Attorney
United States Attorney's Office
Nine Executive Drive
Fairview Heights, Illinois 62208-1344
Phone: (618) 628-3700
Fax:   (618) 622-3810
E-mail: Suzanne.Garrison@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 15, 2025, I electronically filed the foregoing

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

with the Clerk of Court using the CM/ECF system and I hereby certify that I mailed the document, via the United States Postal Service, certified mail no. 9589 0170 5270 0467 5737 48 to the following non- registered participant:

Donald V. Snowden
Register No. 14480-025
Yazoo City FCI - Medium
PO Box 5000
Yazoo City, MS 39194

*Pro se Plaintiff*

*/s/ Jackie Willmann*

30