UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

DONALD V. SNOWDEN

    Plaintiff,

v.

JEREMY HENNING,

    Defendant.

Case No. 19-cv-1322-JPG

## MEMORANDUM AND ORDER

This matter comes before the Court on defendant Jeremy Henning's motion for summary judgment in this excessive force case (Doc. 75). Henning is a special agent of the Drug Enforcement Administration ("DEA") who arrested plaintiff Donald V. Snowden at the Quality Inn Motel in Carbondale, Illinois, on September 12, 2019. Snowden has responded to the motion (Docs. 82 & 86), and Henning has replied to that response (Doc. 85).

Snowden brings this case under *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388, 397 (1971), for violation of his Fourth Amendment right to be free from excessive force when Henning arrested him. *See Snowden v. Henning*, 72 F.4th 237, 245-46 (7th Cir. 2023), *cert. denied*, 145 S. Ct. 137 (2024). The Court finds that no reasonable jury could find Henning used excessive force and, alternatively, that the law at the time did not clearly establish that his conduct was unconstitutional.

Before explaining this conclusion, the Court clarifies what it has considered in its decision. Henning has filed a motion to strike (Doc. 91) Snowden's second response (Doc. 86) to Henning's summary judgment motion as an impermissible sur-reply brief. Indeed, sur-reply briefs are not allowed under any circumstances, SDIL-LR 7.1(a)(4), and Snowden's filing made it to the docket sheet on February 24, 2025, after Henning's February 21, 2025, reply brief (Doc.

85). However, a closer look at the brief reveals that it was placed into the prison mail system by at least February 14, 2025, the date of the postmark. Applying the mailbox rule of *Houston v. Lack*, 487 U.S. 266, 276 (1988), the filing is deemed to have been filed by February 14, 2025, which is before Henning's reply. It is not a sur-reply brief.

And it was filed by the response deadline, so it is not late. It is true that the Court does not encourage piecemeal briefing, but Snowden's second filing simply expounds on an argument he already alluded to in his first response—that the video recording was inadmissible. The Court will allow this leeway to a *pro se* litigant. Ordinarily when the Court accepts a two-part response, it would offer the opposing party an opportunity to supplement or replace its reply, but to do so now would simply delay the process and would not have any bearing on the outcome of this case. For these reasons, the Court will deny Henning's motion to strike Snowden's second response brief (Doc. 91).

## I.  Summary Judgment Standard

Summary judgment is appropriate only if the moving party can show "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party has the burden of establishing that no material fact is genuinely disputed. *Celotex*, 477 U.S. at 323; *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013).

Once a properly supported motion for summary judgment is filed, the adverse party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250 (internal quotations omitted). The Court does not decide the truth of the matters

presented, and it cannot "choose between competing inferences or balance the relative weight of conflicting evidence." *McCottrell v. White*, 933 F.3d 651, 657 (7th Cir. 2019) (internal quotations omitted). On the contrary, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. Nevertheless, the "favor toward the nonmoving party does not extend to drawing inferences that are supported by only speculation or conjecture." *Monroe v. Ind. Dep't of Transp.*, 871 F.3d 495, 503 (7th Cir. 2017) (internal quotations and citations omitted). If the "evidence is such that a reasonable jury could return a verdict for the nonmoving party," then a genuine dispute of material fact exists. *Zaya v. Sood*, 836 F.3d 800, 804 (7th Cir. 2016) (internal quotations omitted).

**II.   Facts**

    A.   Evidence Considered

        1.   Video Recording Offered by Henning

As a preliminary matter, Snowden challenges the admissibility and authenticity of video surveillance evidence, and still images taken from it, that Henning has submitted in support of his summary judgment motion. The video purports to show the lobby of the Quality Inn Motel during Snowden's arrest. Snowden notes, and Henning does not dispute, that the original video from the motel's surveillance system was not able to be downloaded directly from the system when Henning first sought to retrieve it. Instead, Henning used his cell phone to record a video of the surveillance video playing on the motel's system (File IMG-2121.mov). He then emailed the video to DEA Special Agent Roger Ehler. Snowden asserts that Ehler then transferred the file to a DVD, and Henning submitted it to the Court in support of his motion for summary judgment. Snowden focuses on the opportunities for altering the original video that were available during this extended chain of custody.

Ehler, in a sworn declaration, tells a slightly different story. He admits that Henning sent him his recording of the motel's video surveillance, but he states that after Henning was unable to download the actual video file, Ehler went back to the motel and copied three video surveillance files from the motel's computer (Files ch06-201 90912-115644-11 571 8-1 02000000000.mp4, ch06-201 90912-11 5809-1 15914-102000000000.mp4, and ch06-201 90912-120126-120218-1 02000000000.mp4). He states he also confirmed that there were no other cameras in the motel that would have captured the interaction between Henning and Snowden. The three files Ehler gathered directly from the motel as well as Henning's cell phone video were on the DVD received by the Court as Defendant's Video Exhibit 1 (Doc. 76). Ehler states that he reviewed all four files—the one received from Henning and the three he copied directly from the motel—and determined that they were accurate and complete copies of what was gathered in the investigation. Henning submitted that DVD to the Court in support of his motion and included still images taken from that DVD in his briefing.

The Court notes that, although Snowden says the video does not reflect his view of the events, he does not indicate what part of the video he believes is inaccurate. In fact, he refers to the video depictions in his response to support his own position (*e.g.*, that the video shows he had something in his left hand, not his right, as Henning asserts; that Henning's hands were on his chest as he lost his balance). Indeed, most of the alleged excessive force occurred behind a closed door, which is not depicted in the video. Rather than disputing what is shown on the video, Snowden disagrees with the conclusion that he could have posed a danger to Henning at the time. Snowden asks to be able to watch the video with Henning and his attorney so the Court can make an accurate assessment of its merit after hearing from both sides.

The Court has watched all four videos tendered by Henning and declines to hold a

hearing so both parties can comment after the video is played as it did in Snowden's criminal case.[1] There was sufficient opportunity to comment in the summary judgment briefing, and both parties have availed themselves of that opportunity.

The Court is only concerned now with the admissibility of the video. It is true that in ruling on a motion for summary judgment, the Court considers only evidence that would be admissible at trial, although it need not be presented at the summary judgment stage in a form that would be admissible at trial. *Cairel v. Alderden*, 821 F.3d 823, 830 (7th Cir. 2016); *Wragg v. Vill. of Thornton*, 604 F.3d 464, 466 (7th Cir. 2010); *see Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). Before it can be used at trial or summary judgment, video evidence must be authenticated to show that it is what the offering party purports it to be. *See* Fed. R. Evid. 901. Authentication of a recording can be established by a solid chain of custody or by laying a foundation as to its accuracy and trustworthiness. *Smith v. City of Chi.*, 242 F.3d 737, 741 (7th Cir. 2001). A witness may provide that foundation by testifying that the video equipment was recording properly and that the video is a true and accurate depiction of the events that occurred. *See United States v. Cejas*, 761 F.3d 717, 723 (7th Cir. 2014); *Smith*, 242 F.3d at 742. Duplicate recordings are generally as admissible as the original. *Smith*, 242 F.3d at 741.

The Court is satisfied from Ehler's declaration about the chain of custody that the video recording offered by Henning is a complete and accurate copy of what the Quality Inn Motel's video surveillance recorded on September 12, 2019, during Snowden's arrest. The biggest opportunities for alteration were negated by Ehler's return to the scene to directly copy the

---

[1] That hearing was held in connection with Snowden's motion to suppress evidence in his criminal case. It took about four hours to watch the video, interspersed with Snowden's assertions that the person in the video sometimes was not actually Snowden, that he did not actually say what was recorded on the video, and that he was under the influence or under duress at the time.

motel's surveillance system's recording, shortening the chain of custody. There is also not even a hint that the original recording marred or distorted the real occurrences because of the surveillance system's flaws or that any copying process altered the recording. That is sufficient authentication for the Court to judge that the video recording is what Henning purports it is. Any other flaw with the recording would go to the weight of the evidence at trial, not its admissibility. In any case, the parties appear not to dispute the events shown but the events behind a closed door, which is not shown on the video recording.

        2.      "Missing" Video Recording

Additionally, Snowden asserts that the Quality Inn Motel has destroyed video evidence from a camera behind the register in the lobby. Snowden at times states that he personally saw a camera there but admits that, even if there was a camera, he had no personal knowledge that it was working. Even the hearsay Snowden cites shows only that there were four holes in the wall where it is possible a camera, whether working or not, might have been at some point. And the time for him to obtain expert testimony about standard motel practices has passed.

More importantly, there is no foundation for a charge that Henning ever had access to such a video recording or that he intentionally and in bad faith lost or destroyed it such than the Court must, at this stage, draw an adverse inference from the missing evidence. *See Miksis v. Howard*, 106 F.3d 754, 762-63 (7th Cir. 1997) (adverse inference requires intentional, bad faith destruction or loss of evidence); 7th Circuit Civil Pattern Instruction No. 1.20. Summary judgment is the "put up or shut up moment in the life of a case." *AA Sales & Assocs. v. Coni-Seal, Inc.*, 550 F.3d 605, 612 (7th Cir. 2008) (internal quotations omitted). If Snowden does not have evidence of the existence of such a video and Henning's intentionally destroying it to put up now, he is out of luck. The Court draws no inference from the alleged "missing" video

6

footage.

And most importantly, the Court has taken the events in the office behind the closed door *as Snowden himself described them* in his deposition testimony.  Any camera footage could not create a genuine dispute of material fact about what occurred there where Snowden's version is taken as true.

With these rulings in mind, the Court turns to the relevant facts established by the admissible evidence.

B.     Relevant Facts

Construing all Snowden's evidence as true and drawing all reasonable inferences in his favor, the evidence establishes the following relevant facts for the purposes of this motion.

In the summer of 2019, Snowden was the subject of a criminal drug investigation.  On August 2, 2019, he was arrested after a search of his home in which a gun was found.  Although an hours-long interview was conducted primarily by Special Agent Ehler, Special Agent Henning joined for about a half-hour.  During the interview, law enforcement officers told Snowden that they had enough evidence to bring federal charges against him and suggested that if he agreed to be a confidential informant, things might be easier for him.  Then they released Snowden.  Snowden never followed up on the possibility of being a confidential informant.  Nor did he flee the possibility of arrest.  Instead, he remained in Carbondale, Illinois, living openly in the Quality Inn Motel paying day to day.

On September 10, 2019, a grand jury indicted Snowden for distribution of more than 50 grams of actual methamphetamine, a crime that carried a sentencing range of ten years to life. *See* 21 U.S.C. § 841(b)(1)(A)(viii); *United States v. Snowden*, 4:19-cr-40081-JPG.  The Clerk of Court issued a warrant for Snowden's arrest the same day.

On September 12, 2019, Henning led an effort to arrest Snowden at the Quality Inn Motel pursuant to that warrant.[2] Snowden was not a small man at the time; he was about 6 feet tall and weighed just over 200 pounds. While Snowden was at the motel's front desk in the process of paying the motel clerk for his motel room, Henning entered the motel lobby, pulled handcuffs from his back pocket, and held them at chest-level. Snowden only saw Henning out of the corner of his eye as he was entering the lobby and did not recognize him or realize he was being arrested. Henning did not have the arrest warrant in his hand so Snowden could see it to know he was under arrest. Nevertheless, he told Snowden he was under arrest and to put his hands behind him, but Snowden did not hear Henning say anything. Since Snowden did not submit to arrest, Henning attempted to grab Snowden's right arm to put the handcuffs on, but Snowden turned to his side and then began backing away while Henning was grabbing at his chest. Once he saw Henning and his handcuffs, Snowden continued to back away from Henning, who continued to pursue Snowden to try to handcuff him.

As Snowden was backing away, his right hand moved toward his right side where an individual could keep a weapon in a pocket. Snowden ended up backing into the door to the motel office, and as he backed into the office, Henning pushed him in. Snowden lost his balance and fell on the floor in the office; Henning followed him to the ground.[3] After they made it through the door, Snowden first recognized Henning from his August interview. The office door closed behind them, obstructing the view of the lobby surveillance camera. The motel clerk was

---

[2] The motel's video surveillance, at issue in the evidentiary rulings discussed earlier in this order, captured the events occurring in the motel lobby at that time.

[3] It is beyond the Court's comprehension that a motel would not lock the door to its office, especially if it accepted cash payments like Snowden's to rent rooms. It is of no import, but perhaps Snowden and Henning thought they were going to be pushing up against a closed and locked door and only unexpectedly fell through the doorway when the unlocked door opened.

in the office with the two men. The foregoing sequence of events took seconds.

Once behind closed doors[4], both men were on the ground facing up. While Snowden was still on the ground on his back, Henning grabbed Snowden's left arm with one of his hands, and he punched Snowden in the face with the other. While Henning was hitting Snowden, he told Snowden that he was under arrest. Snowden turned away, tried to put his arms up to protect his face, and continued to be in motion to try to get free; he did not offer his hands to be handcuffed. Henning punched Snowden in the face again. Snowden was able to free his left arm from Henning's grip and to stand up. He put his hands out to his side and asked Henning why he was hitting him; again, he did not offer his hands to be handcuffed. At this point, he saw a camera behind the motel cash register pointing in the direction of the scuffle. Henning punched Snowden in the face again, pulled Snowden to the ground, and turned him over onto his front. Snowden then stopped trying to get free and just laid there. Other law enforcement officers arrived on the scene, and one of them handcuffed Snowden from the back. Henning did not hit Snowden again or use any other force after he was handcuffed. Henning punched Snowden no more than four times. Snowden was taken to the Williamson County Jail for detention.

Snowden suffered two black eyes from Henning's hitting him, but he was not bleeding from his injury and did not lose consciousness. He did not seek immediate medical care at the jail, although he did several times in the following weeks. The arrest caused him anxiety, difficulty sleeping, and restlessness. He now has a small knot on a bone in his face.

When Snowden's detention hearing came to be heard on September 19, 2019, the Court did not find he was a danger or a risk of flight. This was because Snowden waived his right to a

---

[4] The description of the events behind the closed door comes from Snowden's deposition testimony. In other words, if Snowden said it happened, the Court assumes it did even without video evidence from the camera Snowden saw behind the cash register.

detention hearing, so the Court never had to make a determination.

Snowden filed this lawsuit in December 2019. After the Court dismissed his claims, the Court of Appeals for the Seventh Circuit reversed the dismissal of his *Bivens* claim for excessive force during his arrest in violation of his Fourth Amendment rights. Henning now seeks summary judgment on that single remaining claim.

## III.   Discussion

Henning argues that Snowden's deposition testimony and other undisputed evidence show Henning acted reasonably under the circumstances, and if there is any doubt about that, he is entitled to qualified immunity. Snowden maintains that Henning used more force than was necessary when he was not actively resisting arrest and was just questioning what was happening and trying to protect his face from punches. The Court starts with qualified immunity because its analysis covers the merits of Snowden's claim as well as the question of immunity.

Qualified immunity is an affirmative defense that shields government officials from liability for civil damages where their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *Denius v. Dunlap*, 209 F.3d 944, 950 (7th Cir. 2000). It protects an official from suit "when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (*per curiam*).

The qualified immunity test has two prongs: (1) whether the facts, taken in the light most favorable to the plaintiff, demonstrate that the officer's conduct violated a constitutional right, and (2) whether the right at issue was clearly established at the time of the alleged misconduct. *District of Columbia v. Wesby*, 583 U.S. 48, 62-63 (2018); *Pearson*, 555 U.S. at 232; *Wilson v.*

*Layne*, 526 U.S. 603, 609 (1999).  While it is often beneficial to first inquire into whether the plaintiff has shown a constitutional violation, the Court has discretion to address the second prong first in light of the circumstances of the case.  *Wesby*, 583 U.S. at 62 n.7 (quoting *Camreta v. Greene*, 563 U.S. 692, 707 (2011)); *Pearson*, 555 U.S. at 236.

A.      Constitutional Violation

There is no evidence from which a reasonable jury could find Henning violated Snowden's Fourth Amendment right to be free from excessive force when he arrested Snowden on September 12, 2019.

The Fourth Amendment forbids unreasonable searches and seizures, including seizures of individuals that are unreasonable because they involve the use of excessive force.  *See Graham v. Connor*, 490 U.S. 386, 394-95 (1989); *Tennessee v. Garner*, 471 U.S. 1, 7-8 (1985).  To determine whether unreasonable force was used, the Court balances the nature and quality of the Fourth Amendment intrusion on the plaintiff with the governmental interest at stake.  *Garner*, 471 U.S. at 8.  The Court must give "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  *Graham*, 490 U.S. at 396.  The test is an objective reasonableness test; that is, the situation should be evaluated from the point of view of a reasonable officer on the scene rather than in 20/20 hindsight.  *Id.*  In its reasonableness determination, the Court must allow "for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."  *Id.* at 396-97.  In sum, the officer's "use of force is unconstitutional if, judging from the totality of the circumstances at the

11

time of the arrest, the officer used greater force than was reasonably necessary to make the arrest." *Chelios v. Heavener*, 520 F.3d 678, 689 (7th Cir. 2008) (internal quotations omitted).

Applying the *Graham* test, no reasonable jury could find Henning used excessive force when he arrested Snowden. Henning used no greater force than was reasonably necessary to get Snowden in a position where he could be handcuffed and no longer pose a threat to Henning or the motel clerk. Snowden was of substantial physical size and by that reason alone posed some degree of threat when trying to arrest him. Going into the arrest, Henning knew Snowden had been charged with a serious drug crime, one which was punishable by a mandatory minimum sentence of ten years in prison. He was also aware that Snowden knew from his previous interview with Ehler and Henning that the DEA was investigating him for drug crimes and believed it had enough evidence to charge him with a federal crime. Thus, to a reasonable officer, it would appear that once Snowden saw Henning, he would recognize him as the DEA agent he had spoken with the previous month. A reasonable officer would think that, once Snowden saw a DEA agent with handcuffs and felt him trying to grab his arm, Snowden would conclude he was about to be arrested and might try to avoid the arrest. Thus, a reasonable officer in Henning's position would have expected to have to prevent Snowden from evading arrest.

Henning also knew that Snowden had, in the recent past, possessed a firearm in connection with his alleged drug activities; one was found in the search of his apartment the previous month. Henning was also aware that the arrest would likely occur in the presence of an innocent bystander, the motel clerk, who could have been harmed in the effort to subdue Snowden should it turn violent. A reasonable officer, knowing these things, would likely increase his assessment of the force necessary to mitigate the threat to himself and the innocent bystander.

12

Additionally, Snowden did not submit to Henning by offering his hands to be cuffed once the arrest began. Henning was of the impression that he had announced when first approaching Snowden that he was under arrest, although Snowden did not hear Henning say that. When Snowden began backing away, from Henning's point of view, it appeared Snowden knew he was going to be arrested and was resisting. Not violently resisting, but resisting nonetheless. And once he began backing up, Snowden moved his right hand toward his pocket area, where individuals can easily carry a weapon. A reasonable officer in Henning's position would think that Snowden's backing up, his refusing to present his hands for cuffing, and the hand movement toward his pocket area increased the threat level substantially. A reasonable officer would think that, in the situation faced by Henning at that time, resort to physical force like pushing Snowden backwards and to the ground was reasonable.

Once the pair were behind closed doors and lying on the ground, Henning understood Snowden was not going to voluntarily offer his hands to be handcuffed. Instead, Snowden questioned why he was being arrested. The movement into the motel office increased the immediate threat to the clerk, who was now trapped in the same room with the men. A reasonable officer in Henning's situation would think that more force, like a punch to the face, was reasonable to subdue Snowden and prevent him from reaching any weapon he may have had. And a reasonable officer would also consider that when Snowden moved his arms up to his head to protect his face, and then when he stood and put his hands out to his sides, he was continuing to resist arrest. That reasonable officer would have thought an additional punch in response to each act of resistance was necessary to subdue Snowden.

There is no evidence that any other punches or alleged use of excessive force were used after Snowden was placed in handcuffs. And although the force Henning used was sufficient to

give Snowden two black eyes, the residual harm was not substantial—exacerbation of anxiety and sleep problems and possibly a small knot on a bone.

Snowden's claims that he was not resisting might have been true in his own mind, but to a reasonable officer in Henning's position, knowing what he knew and appreciating the danger to himself and the motel clerk, Snowden's acts were resisting arrest. That Snowden was *not* charged with the crime of resisting arrest is not relevant to whether Henning reasonably perceived him as doing so. Objectively, force was required. And judging from the totality of the circumstances at the time of the arrest, no reasonable jury could find Henning used greater force than was reasonably necessary to arrest Snowden in violation of his Fourth Amendment rights.

### B.    Clearly Established Law

Under the second qualified immunity prong—whether the law was clearly established at the time of the defendant's conduct—the law at the time of the conduct "must have placed the constitutionality of the officer's conduct beyond debate" such that "every reasonable official would understand that what he is doing is unlawful." *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018) (internal quotations omitted). It must have been "settled law," that is, it must have been "dictated by controlling authority or a robust consensus of cases of persuasive authority." *Id.* (internal quotations omitted). Generally, this requires a high degree of specificity in the precedent so that every reasonable officer would have been alerted to the law in the particular circumstances. *Id.* And it is incumbent on the plaintiff to show the clear establishment of the law in the particular circumstances. *Denius v. Dunlap*, 209 F.3d 944, 950 (7th Cir. 2000).

In September 2019, it was not settled law that Henning's use of force during Snowden's arrest violated Snowden's Fourth Amendment right to be free from excessive force. It is generally true and well-settled that an arrestee has the right to be free from the use of excessive

force. *Snowden v. Henning*, 72 F.4th 237, 246 (7th Cir. 2023), *cert. denied,* 145 S. Ct. 137 (2024). In that decision, the one that remanded this case for further proceedings, the Court of Appeals noted "decades of circuit precedent applying" *Graham v. Connor*, 490 U.S. 386 (1989), that gave officers "clear guidance on the level of force that is reasonable when arresting a suspect that does not resist." However, the parties have not cited, and the Court has not independently located, any case with facts sufficiently similar to those of this case that would have alerted a reasonable officer that conduct like Henning's was unconstitutional.

Snowden points to *Abbott v. Sangamon County.*, 705 F.3d 706 (7th Cir. 2013), to show that in September 2019, a reasonable officer would have known that he could not use significant force to arrest Snowden in the circumstances Henning faced. It is true that *Abbott* and the cases it cites established that an officer could not use significant force on a non-resisting arrestee and that, even if he were justified in initially using force, the force must stop once the arrestee is subdued. *Abbott*, 705 F.3d at 732. But the facts in *Abbott* are meaningfully distinguishable from the facts in this case.

There, animal control officers responded to a report of the Abbotts' dog running loose in the neighborhood. *Id.* at 709. An officer saw the dog in the Abbotts' garage and Travis Abbott running into the house. *Id.* From inside the house, Travis interfered with the officers' attempts to catch the dog. *Id.* He also gave them "the finger," and told the officers if they touched his dog, he would knock them out and other similar threats, none of which referred to firearms or other weapons. *Id.* The animal control officers called the police, and Travis called his mother, Cindy. *Id.* Cindy came to the house and eventually convinced Travis to leave the house and talk to the police, where he admitted threatening the animal control officers. *Id.* at 710. Travis was arrested, handcuffed behind his back, and placed in the back seat of a squad car. *Id.*

15

Travis then began "going nuts" and trying to escape. *Id.* While backing the squad car out of the driveway and trying to subdue Travis at the same time, Deputy Sweeney backed into Cindy's car. *Id.* Cindy began yelling and walked toward her car to inspect the damage, but when the Deputy Sweeney got out of the car, he thought Cindy was trying to help her son escape from the squad car. *Id.* at 710-11. He twice ordered her to stop, and when she did not, he shot her in the abdomen with a taser in dart mode[5] without any warning. *Id.* at 711. Sweeney then ordered Cindy to roll over onto her stomach, which she could not do because the taser blast had immobilized her, so he shot her with a taser blast a second time, rolled her over, and placed handcuffs on her. *Id.* Once Cindy was subdued, Deputy Sweeney returned to Travis and used the taser on him numerous times. *Id.*

When Travis and Cindy sued the officers under § 1983, the Court of Appeals for the Seventh Circuit affirmed the dismissal of all the claims except Cindy's claim for excessive force by the second taser blast. There, the Court observed that, with respect to pepper-spray, "it is excessive to use such force on a subdued suspect." *Id*. at 727 (collecting cases). It concluded, however, that Travis was actively resisting Deputy Sweeney so the force was reasonable. *Id.* at 727-28. As for Cindy, it was clear that the second taser to Cindy was excessive where she was suspected of committing only a misdemeanor, was not actively resisting, and posed no threat to Deputy Sweeney or anyone else at the time. Those are the main legal principles regarding excessive force established by *Abbott*.

The specifics of this case are not at all like those in *Abbott*. Henning did not face a situation comparable to Deputy Sweeney's. Deputy Sweeney was coming to assist in an animal

---

[5] A taser used in "dart" mode uses substantially more electric current and causes substantially more debilitation than one used in "drivestun" mode. *Abbott*, 705 F.3d at 725-26.

16

control situation that had grown into a series of obstructions to law enforcement. Henning, on the other hand, was attempting to arrest an indicted suspect charged with felony drug crimes, one of which carried a ten-year mandatory minimum sentence and only a month after a gun had been located at the suspect's apartment. Additionally, Snowden had made moves toward his front pocket, which might have contained a gun or other weapon. And seconds after that, Henning was wrangling with Snowden in close quarters with an innocent third party who was trapped in the room with them. The threat posed by the arrestee was substantially more serious with Snowden than with either Travis or Cindy. The differences in seriousness of the offenses and the dangerousness of the suspects cannot be overstated.

Additionally, the methods of using force on the suspects were not comparable—tasing in dart mode compared to several punches to the face. Except for the general principle that an officer should not use significant force on a subdued suspect, *id.* at 727, any established law regarding the use of a taser, especially in dart mode that can immediately incapacitate with a single application—does not establish the law on the use of fists. The nature and degree of the intrusions on an individual is too different.

And as for that general principle—that the use of significant force on a subdued suspect is excessive—that guardrail did not apply because Snowden was actively resisting arrest, although not as vociferously as Travis in *Abbott*, when Henning hit him. Snowden first backed away from Henning when he saw the handcuffs and for the remainder of the encounter he failed to submit to be cuffed and was moving to try to stand up until the very end. He was not like Cindy in *Abbott*—immobilized on the ground. While he was not running or punching back at Henning, he was physically trying to resist being arrested. He was not subdued when Henning punched him, and no significant force was used once Snowden was in handcuffs. *Abbott* does

not establish that Henning's conduct was unconstitutional.

*Abbott* is missing the high degree of specificity to make it clear to every reasonable officer that Henning's conduct, in the circumstances he faced, violated the Constitution. Snowden has not pointed to any other case clearly establishing the unconstitutionality of Henning's use of force.[6]  Therefore, Henning is entitled to qualified immunity.

## IV. Conclusion

For the foregoing reasons, the Court:

- **DENIES** Henning's motion to strike Snowden's sur-reply brief (Doc. 91);

- **GRANTS** Henning's motion for summary judgment (Doc. 75);

- **DENIES as moot** Snowden's motion for recruitment of counsel (Doc. 80) and motion for a writ of habeas corpus ad prosequendum (Doc. 87); and

- **DIRECTS** the Clerk of Court to enter judgment accordingly.

**IT IS SO ORDERED.**
**DATED:  March 11, 2025**

s/ J. Phil Gilbert
**J. PHIL GILBERT**
**DISTRICT JUDGE**

---

[6] Snowden makes passing reference to *Gonzalez v. City of Elgin*, 578 F.3d 526 (7th Cir. 2009), a case involving law enforcement officers who, without provocation, punched, kicked, beat, and pepper-sprayed suspects without probable cause and after they were subdued and not resisting. That use of force greatly exceeded the few punches made by Henning to a physically resisting suspect for whom an arrest warrant had been issued, so it does not clearly establish Henning behaved unconstitutionally in the circumstances he faced.